IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LABORERS' PENSION FUND, et al.,    )
                                   )
                Plaintiffs,        )
                                   )
     v.                            )    No.  01 C 6855
                                   )
LAY-COM, INC., et al.,             )
                                   )
                Defendants.        )

<u>MEMORANDUM OPINION AND ORDER</u>

Laborers' Pension Fund and Laborers' Welfare Fund of the
Health and Welfare Department of the Construction and General
Laborers' District Council of Chicago and Vicinity and their
administrator, James Jorgensen (collectively "Funds") have
brought suit against Lay-Com, Inc. ("Lay-Com"), Lord & Essex,
Inc. ("Lord & Essex"), John Popp Jr. ("Popp Junior") both
individually and as Trustee of the Irrevocable Lay Trust Dated
December 26, 1995 ("Lay Trust"), Doralee King ("Doralee") and
Gail King ("Gail").  Funds charge that it was denied benefit
contributions, union dues and payments on an installment note in
violation of the Employee Retirement Income Security Act of 1974
("ERISA") and the Labor Management Relations Act of 1947.

At long last the extensive proceedings in this hoary action
have reached the point at which the principal litigants have
found it possible to move for summary judgment under Fed. R. Civ.
P. ("Rule") 56, and cross-motions have been filed (1) by Funds
and (2) by two separate pairs of defendants:  (a) Lay-Com and Lay

Trust jointly and (b) Lord & Essex and Popp Junior jointly (for convenience both sets of moving defendants are collectively termed "Defendants").[1]  For the reasons explained here, Funds' motion is granted in principal part (with a corresponding denial of Defendants' motions), while the converse is true as to Funds' claim against Popp Junior in his individual capacity.

Summary Judgment Standards

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).  For that purpose courts "consider the evidentiary record in the light most favorable to the nonmoving party...and draw all reasonable inferences in his favor" (<u>Lesch v. Crown Cork & Seal Co.</u>, 282 F.3d 467, 471 (7th Cir. 2002)).  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (<u>Pugh v. City of Attica</u>, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate an issue of triable fact" (<u>id</u>.).  Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant (<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

_____

[1]  Gail and Doralee have not filed Rule 56 motions of their own, nor have they been targeted by Funds' Rule 56 motion.  Hence Funds' claims against those defendants are unaffected by this opinion.

Finally, where as here cross-motions for summary judgment are involved, those principles require the adoption of a Janus-like perspective:  As to each motion, the nonmovant's version of any disputed evidence-supported facts is credited.

<u>Evidentiary Issues</u>

In an effort to highlight the existence or nonexistence of material factual disputes, this District Court's LR 56.1 requires both (1) that the movant file a "statement of material facts" organized by numbered paragraphs, each with specific citation to the evidentiary record (LR 56.1(a)(3)), and (2) that the nonmovant file a paragraph-by-paragraph response to that statement, also with specific record citations (LR 56.1(b)(3)(A). Although the nonmovant may of course advance "additional facts" as well, that must be done in a separate statement of numbered paragraphs, again with specific citations to the evidentiary record (LR 56.1(b)(3)(B); <u>Ammons v. Aramark Unif. Servs., Inc.</u>, 368 F.3d 809, 817 (7th Cir. 2004)).

Given the importance of LR 56.1's function, our Court of Appeals has consistently made clear that District Courts are entitled to strict adherence to LR 56.1 and may penalize violations by disregarding a party's noncompliant factual statements or by simply adopting the opposition's statements (see, e.g., <u>Ammons</u>, 368 F.3d at 817-18 and cases cited there). Here both sides, but particularly Defendants, have committed a

number of violations of LR 56.1.  Those flaws are identified
hereafter.

Most importantly, Defendants have failed to respond
adequately to Funds' LR 56.1(a)(3) statement of facts.[2]  Neither
set of Defendants has offered anything remotely resembling the
sort of separate paragraph-by-paragraph responses to that
statement that LR 56.1(b)(3)(A) requires.  Indeed, the only
attempt to contest Funds' LR 56.1(a)(3) statement in any respect
is set out in the Lord & Essex-Popp Junior responsive memorandum,
which briefly takes issue with the audit report upon which
portions of Funds' statement is grounded (L.E. Resp. Mem. 13,
¶36).[3]  But that is wholly at odds with the purpose as well as

---

[2]  While the parties did file an Agreed Stipulation of Facts
("Stipulation"), Funds has also supported its Rule 56 motion with
a separate LR 56.1(a)(3) "Statement of Undisputed Material Facts"
that addresses the amount of unpaid monies at issue.  This
opinion cites to that statement as "F. St. ¶--" and to the
Stipulation as "Stip. ¶--."  Funds' memorandum of law, its
memorandum in response to Defendants' motion and its reply
memorandum are respectively cited "F. Mem.--," "F. Resp. Mem.--"
and "F. R. Mem --."  Those same "Mem." and "Resp. Mem."
designations are applied to the memoranda of law and responsive
memoranda of Lay-Com and Lay Trust (collectively "L.C.") and
Lord & Essex and Popp Junior (collectively "L.E.").

[3]  Although the "Statement of Facts" contained in the Lord &
Essex-Popp Junior memorandum at least makes some responsive
effort, it responds not to Funds' LR 56.1(a)(3) statement but to
the general factual narrative provided in the body of Funds'
initial Memorandum, and in any case it falls far short of meeting
the standards of LR 56.1(b)(3)(B)(L.E. Resp. Mem. 2-6, ¶¶3-15).
Indeed, even apart from the fatal defects identified in the text
that follows, the asserted shortcomings are without merit in any
event.

the express requirements of LR 56.1(b)(3)(A), as to which this Court is entitled to require strict compliance (again see <u>Ammons</u>, 368 F.3d at 817-18 and cases cited there). This opinion accordingly disregards that effort and accepts Funds' LR 56.1 statement of facts on that score.

In addition to failing to respond properly to Funds' statement of facts, Defendants have also failed to comply with LR 56.1 in introducing their own facts. For example, although the Lay-Com-Lay Trust responsive memorandum purports to rely on "facts" beyond those included in the Stipulation, those Defendants have offered no LR 56.1(b)(3)(B) statement of those additional facts. Instead they cite new exhibits attached to their memorandum (see, e.g., L.C. Resp. Mem. 6-7). That same flaw exists in the Lord & Essex-Popp Junior initial Rule 56 memorandum, though it is far more limited in scope there (see, e.g., L.E. Mem. 4, ¶12). Again this opinion has not credited those improperly presented (and, as discussed further below, often ill-supported) factual claims (see, e.g., <u>Cichon v. Exelon Generation Co.</u>, 401 F.3d 803, 810 (7th Cir. 2005)).

Finally, the parties have been less than diligent about properly supporting their factual assertions--whether or not adequately presented--with citations to the evidentiary record. On occasion they have cited to portions of the record that do not actually support the facts asserted, and in other instances they

have offered no citations at all.  On still other occasions some parties have mischaracterized or misrepresented the cited evidence.  In all such instances this opinion has simply not credited factual assertions by any party that are not expressly supported by competent evidence.

Background[4]

King & Larsen Construction, Inc. ("King & Larsen") was incorporated in February 1995, and at all times relevant to this litigation Mike King ("King") was an officer, director and shareholder (Stip. ¶¶5-6).  In May 1995 King & Larsen entered into a Memorandum of Joint Working Agreement ("1995 Agreement") with the Construction and General Laborers District Council of Chicago and Vicinity and Laborers Local Union No. 288 (id. ¶31). Under the 1995 Agreement King & Larsen was required to make monthly benefit contributions to Funds on its employees' behalf and to submit its books and records to Funds for periodic audits to determine compliance with that requirement (F. St. ¶2). Failure to make payments on time required King & Larsen to pay liquidated damages of 10% plus interest at a rate of 2% over prime (id.).

Over the years at least some of the contributions owed by King & Larsen under the 1995 Agreement were not paid (id. ¶¶7-9).

---

[4] All corporate entities referred to in this opinion were incorporated in Illinois (id. ¶¶5, 7-9).

6

In February 2001 King & Larsen executed an Installment Note
payable to Funds to cover certain of those past-due contributions
(those owed for November 2000 through January 2001), and King
signed a personal guaranty of that Note (Stip. ¶32).

Other significant players in this litigation are a trio of
entities closely related to the Popp family: Lord & Essex, Lay
Trust and Lay-Com. Lord & Essex, a construction company, came
into being in April 1992, and at all times relevant here its
President and Director was John Popp Senior ("Popp Senior"),
while his son Popp Junior served as its Vice-President and
Treasurer (Stip ¶¶9, 12, 13). Lay Trust was created a few years
later (in December 1995), with Popp Senior and Loreen Popp as its
primary beneficiaries and with distributions to be made to their
surviving family members (including Popp Junior and his sister
Kari Harrison ("Harrison")) in the event of their deaths (id..
¶¶78, 81). Popp Senior was also Trustee of Lay Trust until he
died during the pendency of this litigation, at which point Popp
Junior and Harrison became Co-trustees and Popp Senior's assets
became part of the Lay Trust corpus (id. ¶81).[5] Lay Trust was
the sole shareholder of Lord & Essex until March 2002, when Popp
Junior became its sole shareholder by a purchase from Lay Trust

---

[5] For that reason Popp Junior, in his capacity as Trustee of
Lay Trust, was substituted for Popp Senior as a defendant in
Funds' Second Amended Complaint ("SAC"). Popp Junior is thus
being sued here (and is therefore targeted by Funds' current
motion) in a dual capacity.

(id. ¶12).  Lay-Com, which primarily engages in the purchase,
development and sale of properties for commercial and residential
development, was incorporated in September 1999 (id.. ¶8).  At
all times relevant to this litigation Popp Senior was President,
Treasurer and a director of Lay-Com, Popp Junior was a director
and its Vice-President and Lay Trust was its sole shareholder
(id. ¶¶12-13, 81).

Finally, M.A. King Construction ("M.A. King") was
incorporated on March 19, 2001 (Stip. ¶7).[6]  M.A. King's original
directors were Popp Senior, Popp Junior and King, and on April 1,
after adopting corporate bylaws, those directors elected King as
President and Treasurer and his then wife Gail as Vice President
and Secretary (id. ¶¶11, 21).  M.A. King's directors further
adopted a resolution to issue 25,000 M.A. King shares to the
G.A.K. Irrevocable Living Trust ("G.A.K. Trust"), an entity
created on the same day (its sole asset was to be all of M.A.
King's issued and outstanding shares, and its start-up documents
were initially drafted by the Lay-Com-Lord & Essex attorney (id.
¶¶28, 56)), in consideration for a $25,000 promissory note (id.
¶¶21, 29).  But there is no evidence that any such issuance of
stock or delivery of a promissory note ever took place (id. ¶29).

In short, although M.A. King received a corporate charter

---

[6] As all remaining relevant events also occurred in 2001,
subsequent date references will omit the year designation.

from the State of Illinois, nothing supports its bona fide corporate existence.  In the same vein of the absence of normal business and corporate attributes, Lay Trust later made a number of outright payments to M.A. King during its life span, but there is no evidence of any accompanying loan or other documentation (id. ¶92).

During the April 1 organizational meeting the directors also authorized King, as President of M.A. King, to enter into banking relationships but prohibited him from borrowing money on the corporation's behalf without written consent from Lay-Com (Stip. ¶22). They further "resolved that none of the Powers and Resolutions agreed to by the Directors conferring the various powers to the President...could impair the corporation's ability to repay the debt owed to Lay-Com" (id. ¶22).  Finally, the directors entered into an Employment Agreement with King (with King abstaining from the vote due to conflict of interest) that, among other things, granted him a salary but denied him the power to authorize, approve or incur on M.A. King's behalf any $2,500 or greater "distribution, expenditure or monetary obligation" (other than those arising from payroll or tax obligations) without first complying with "third party distribution procedures" to be detailed in a Master Lease and Assignment Agreement ("Master Lease and Assignment") between Lay-Com and

M.A. King (a document discussed further below) (<u>id</u>. ¶¶23-25).[7]

Beginning on April 24 King & Larsen, Lord & Essex, Lay-Com and M.A. King rapidly entered into a series of agreements and transactions with one another, seeking (1) to create M.A. King as a "new entity without union obligations" and (2) at least initially, "to secure first priority lien position for Lord & Essex on the assets of King & Larsen" (Stip. ¶¶53, 55). To secure King's cooperation in those transactions, Popp Senior agreed to release a junior mortgage on Doralee's house (<u>id</u>. ¶47). As that string of transactions is crucial to the analysis of Funds' claims, this opinion will address them in some detail.

First, King & Larsen entered into an Assignment of Collateral and Satisfaction of Debt with Lord & Essex ("Lord & Essex Assignment"), under which King & Larsen assigned all of its assets to Lord & Essex, including well over $1.2 million in "contract receivables," an inventory of vehicles and mobile equipment of unspecified value,[8] over $60,000 in "shop

_____

[7] Although King was terminated by vote of M.A. King's directors (again with King abstaining) as President and Treasurer a month after that meeting, he remained a director, and his employment contract with M.A. King was substantively unaffected (<u>id</u>. ¶¶26, 38). King's wife Gail was elected to fill his positions, while King's mother Doralee took over for Gail as Vice President and Secretary (though Doralee herself was not aware she had been so elected until November 2002) (<u>id</u>. ¶¶26, 45).

[8] Although the parties stipulate that "the equipment and vehicles used by M.A. King" have been appraised at just over $1 million (Stip. ¶51), it is not clear whether that appraisal includes only the vehicles obtained from King & Larsen or also

materials," "general intangibles" and the policies insuring any
of the assets (Stip. ¶14).  In return Lord & Essex extinguished
over $400,000 in King & Larsen debts (using money it borrowed
from Lay-Com) and agreed to assume nearly $1.5 million in
liabilities comprising accounts payable and two specified "Notes"
(id. ¶¶14, 16).  Lord & Essex did not expressly assume the
remaining liabilities of King and Larsen (id.).[9]

On that same day Lord & Essex assigned to Lay-Com (in the
"Lay-Com Assignment") both the assets and the liabilities it had
just received from King & Larsen under the Lord & Essex
Assignment (Stip. ¶16).  In return Lay-Com deemed satisfied the
loans that Lord & Essex had obtained from it to finance the Lord
& Essex Assignment (id.).  Unless there is something more to it
than meets the eye, it appears that the two successive steps
involved Lord & Essex as a mere conduit for what was really a
King & Larsen-Lay-Com transaction.  In the end, some of the King
& Larsen obligations initially assumed by Lord & Essex were in
fact paid by Lay-Com (id.¶¶59-62).

Finally, on May 1 Lay-Com and M.A. King entered into the
Master Lease and Assignment (Stip. ¶18).  Under the Master Lease
and Assignment Lay-Com agreed to lease to M.A. King what had been

_____

those that Lay-Com had bought on its own.

[9]  King & Larsen was then formally dissolved on July 2 (id.
¶5).

11

the King & Larsen vehicles and mobile equipment and to assign to
M.A. King the other former King & Larsen assets, including all
contract receivables and work in progress accounts as well as the
former inventory (excluding vehicles and mobile equipment) (id.
¶19).[10] In return M.A. King agreed to make lease payments to
Lay-Com of $17,805.24 a month starting June 1, as well as a
bimonthly "Operations Fee" equal to 50% of M.A. King's profits
over the prior two-month period (id. ¶19)--but as matters
developed M.A. King never actually made any of those payments
(id. ¶49). In addition M.A. King also agreed to assume all the
former liabilities of King & Larsen that Lay-Com had assumed in
the transactions in which Lord & Essex was a conduit (id. ¶19).
And significantly the Master Lease and Assignment also included a
"Third Party Distribution Restriction," pursuant to which M.A.
King could not enter into any cash and asset transfers, payments
or distributions other than for "ordinary business expenses" to
any third party without both getting Lay-Com's written
authorization and making a "Third Party Distribution Bonus"
payment to Lay-Com, equal in value to the proposed third party
distribution (id.).[11]

---

[10] Indeed, Lay-Com eventually ended up also footing the bill
for new equipment and materials to be used by M.A. King, above
and beyond the old King & Larsen assets (see, e.g., Stip. ¶¶66-
67).

[11] Those are the "third party distribution procedures" with
which, as mentioned earlier, King's Employment Agreement with

When the dust had settled from that spate of transactions,[12] M.A. King was left operating its construction business from the same yard and office that King & Larsen had used, using the same fax and telephone number, employing the same employees, using the same equipment and even performing King & Larsen's existing contracts (Stip. ¶¶44, 82). Indeed, despite the terms of the Master Lease and Assignment M.A. King was not always paid for the King & Larsen contract receivables it had acquired from Lay-Com-- on two occasions Lord & Essex made payments for prior King & Larsen services not to M.A. King, but to Lay Trust (id. ¶¶90-91). On another occasion, while M.A. King was paid for work it (rather than King & Larsen) had done for Lord & Essex, that payment was made not by Lord & Essex but by Lay-Com (id. ¶69).

Also that summer, Funds began to receive payments out of M.A. King's accounts on some of the obligations owed by King & Larsen, including both the normal monthly contributions for February and March and some of the payments due on the Installment Note (though the last of those installments remained outstanding) (Stip. ¶¶34-36; F. St. ¶6). On September 11 King

---

M.A. King required him to comply before authorizing any $2,500 or greater "distribution, expenditure or monetary obligation."

[12]   In candor, the entire quickly-executed series of transactions has all the flavor of a carnival sideshow, with the rapid movement of shells (in the figurative sense) leaving the viewer to guess which one hides the figurative pea of liability in Funds' favor.

signed an Independent Construction Industry Collective Bargaining Agreement with the Construction and General Laborers District Council of Chicago and Vicinity ("September 11 Agreement"), purportedly on behalf of M.A. King (id. ¶33).[13]

Aware of M.A. King's payments to Funds, on September 21 Lay-Com sent a letter to King advising him that those payments had violated the Third Party Distribution Restriction and urging him "to take whatever action necessary to comply with" those restrictions (Stip. ¶37). Three days later the directors of M.A. King (including King) "entered into an informal action and consent thereto disapproving the [September 11 Agreement]" (id. ¶38), and on October 5 Popp Senior and Popp Junior resigned from the M.A. King Board (id. ¶39). Finally, Lay-Com filed suit against King and M.A. King on October 12, based among other things on M.A. King's (1) violation of the Master Lease and Assignment by not complying with Third Party Distribution Restrictions and (2) failure to make its monthly lease payments (id. ¶86). Lay-Com obtained an Agreed Judgment Order on that claim on October 30 (id. ¶87).

Despite those upheavals M.A. King nevertheless continued working on projects, at least for Lord & Essex, until "the end of

_____

[13] Although defense counsel seek to make something of their clients' noninvolvement in the September 11 Agreement, as explained later it is really irrelevant to the issues now before this Court.

November or early December" (Stip. ¶85). About December 3 or 4,
however, Lord & Essex informed M.A. King that it would no longer
be needed on those projects (id.), and by early in the new year
M.A. King had been dissolved (id. ¶7).

Lastly, as to the amount in controversy in this litigation,
as of the time of Funds' F. St. ¶¶6-9 the aggregate indebtedness
owed to it came to $2,487,723.62. Though Defendants' responsive
memoranda purport to question that figure, they have proffered no
evidence to counter it.

## Procedural History

This action was brought fully five years ago--on August 31,
2001. Over that time Funds have amended their initial Complaint
twice to adjust the list of defendants, and this Court has
entered two default judgments: one against King and King &
Larsen on January 23, 2002 and one against King, King & Larsen
and M.A. King on October 30, 2003. As stated at the outset, each
of Funds and two separate pairs of Defendants--Lay-Com and Lay
Trust, and Lord & Essex and Popp Junior--have now filed Rule 56
motions for summary judgment.

## M.A. King's Liability for King & Larsen's Obligations

In determining who is and is not liable for the obligations
at issue here, the parties have first joined battle over the
threshold question whether M.A. King was a "successor and/or
alter ego" of King & Larsen and could therefore be held liable

15

for King & Larsen's obligations.  As the ensuing analysis reflects, the undisputed evidence confirms that M.A. King was indeed a successor to King & Larsen.[14]

Pursuant to federal substantive law (which supplants state common law in the ERISA context--see, e.g., <u>Moriarty v. Svec</u>, 164 F.3d 323, 328-29 (7th Cir. 1998)), successor liability applies as long as (1) there is  "substantial continuity in the operation of the business before and after the sale" and (2) "the successor had notice of the claim [against its predecessor] prior to acquisition" (<u>Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund v. Tasemkin, Inc</u>., 59 F.3d 48, 49 (7th Cir. 1995)).  Here Funds has established both elements of that test.[15]

First, it is undisputed that M.A. King operated from the

_____

[14]   That being true, this opinion need not address Funds' arguments as to alter ego liability as well.

[15]   Defendants have offered no substantive challenge to M.A. King's successor (or alter ego) liability.  Instead their memoranda have focused on challenging Funds' initial claim that this Court's October 30, 2003 entry of a default judgment against M.A. King, King & Larsen and King had established M.A. King's successor or alter ego liability once and for all, precluding the remaining defendants from contesting the merits of the issue.  As Defendants correctly argue, the majority of federal courts (including our own Court of Appeals) hold that "default judgments do not give rise to collateral estoppel"--at least as to those (such as Defendants) who were not party to that default (<u>Stephan v. Rocky Mountain Chocolate Factory, Inc.</u>, 129 F.3d 414, 418 (7th Cir. 1997), citing <u>United States v. Bailey</u>, 957 F.2d 439, 443 (7th Cir. 1992)).  Yet having demonstrated that they <u>could</u> potentially contest M.A. King's successor liability on its merits, Defendants have inexplicably failed to do so.

same yard and office as King & Larsen, used the same telephone and fax number, employed the same employees, retained a common officer, used the same equipment, performed the same kind of work for the same clients and even continued working on the contracts that King & Larsen had left unfinished. There could scarcely be a more conclusive showing of "continuity" sufficient to establish the first element of federal successor liability (see, e.g., <u>Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac</u>, 920 F.2d 1323, 1329 (7th Cir. 1990) as well as <u>Chicago Truck Drivers</u>, 59 F.3d at 49).

It is similarly undisputed that King was an officer and director in both King & Larsen and (at least initially) in M.A. King. Given King's positions in both the predecessor and the assertedly successor entities, there is no question that M.A. King had notice, through King, of King & Larsen's obligations to Funds.[16]

In short, Funds have plainly satisfied their summary judgment burden as to both elements of the federal test. M.A. King was therefore a successor of King & Larsen, and it was therefore bound by the latter's agreements and liable for its

---

[16] Nor have Defendants challenged M.A. King's successor liability by questioning the adequacy of notice--or, for that matter, on any other merits-related ground.

obligations.[17]

<u>Defendants' Liability for King & Larsen's Obligations</u>

Funds next seek to extend the M.A. King liability for King & Larsen's obligations to Funds' ultimate targets--Lay-Com, Lord & Essex and Popp Junior (the latter both individually and as Trustee of Lay Trust)--by asking this Court to "pierce the corporate veil" of M.A. King. Unlike Funds' "successor" claim, which drew on federal law, that claim is evaluated under Illinois law. All the parties have thus looked to the Illinois caselaw, and this opinion will do the same.

Under Illinois law corporations are generally treated as legal entities separate and distinct from their shareholders, directors, officers and corporate parents or subsidiaries (<u>In re Rehabilitation of Centaur Ins. Co.</u>, 158 Ill.2d 166, 172, 632 N.E.2d 1015, 1017 (1994)). But that separate corporate identity will be disregarded--and the "corporate veil" pierced or alter ego status established--where two requirements are met (<u>Van Dorn Co. v. Future Chem. and Oil Corp.</u>, 753 F.2d 565, 569-70 (7th Cir.

_____

[17] As Funds argue, the question whether M.A. King might also be liable for further obligations due to the September 11 Agreement is of no consequence. Indeed, Funds' memoranda make clear that the relief it seeks is the recovery of the obligations originally incurred by <u>King & Larsen</u> (F. R. Mem. 4-5; F. Resp. Mem. 3). Whether M.A. King might have incurred additional obligations on its own (rather than as a successor entity)--an argument to which defense counsel regrettably dedicated a significant amount of time, energy and ink--is entirely irrelevant to the claims pursued here by Funds.

1985), quoting an Illinois Appellate Court case that states the Illinois rule (brackets in original)):

> First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.

In determining whether sufficient "unity of interest" exists, Illinois courts consider a number of factors, including (In re Estate of Wallen, 262 Ill.App.3d 61, 69, 633 N.E.2d 1350, 1357 (2d Dist. 1994)):

> inadequate capitalization; failure to issue stock; failure to observe corporate formalities; nonpayment of dividends; insolvency of the debtor corporation; nonfunctioning of the other officers or directors; absence of corporate records; commingling of funds; diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; failure to maintain arm's length relationships among related entities....

As to "sanctioning fraud" or "promoting injustice," while the party seeking to pierce the veil need not demonstrate fraud or "an intent to injure creditors" (Van Dorn, 753 F.2d at 571), it must show "something more than the mere prospect of an unsatisfied judgment," such as "some element of unfairness...or the existence of a compelling public interest" (Hystro Prods., Inc. V. MNP Corp., 18 F.3d 1384, 1390 (7th Cir. 1994), internal quotation marks omitted). For example, courts have found that second element satisfied when failure to pierce the veil would (id., citations omitted):

> unfairly enrich one of the parties; allow a parent
> corporation, that had created a subsidiary's
> liabilities and was the cause of the subsidiary's
> inability to meet them, to escape responsibility;...or
> uphold a corporate arrangement to keep assets in a
> liability-free corporation while placing liabilities on
> an asset free corporation.

Because that articulation of the doctrine speaks of the relationships between corporations (though as explained hereafter its scope is not limited to such relationships), this opinion turns first to examining Lay-Com's status in that respect. It will then go on to look at Funds' other targets.

Despite defense counsel's protestations to the contrary, it cannot be gainsaid that Funds have successfully established both elements required to "pierce the corporate veil" embodied by M.A. King--an exceedingly flimsy one--and to attach liability to Lay-Com as well. Not only was there clearly a "unity of interest" between M.A. King and Lay-Com, but to adhere to the "fiction of [their] separate corporate existence" would indeed "promote injustice" here.

For example, the evidence plainly establishes that M.A. King was undercapitalized, "a major factor in assessing whether a legitimate separate corporate entity existed" (Fiumetto v. Garrett Enters., Inc., 321 Ill.App.3d 946, 959, 749 N.E.2d 992, 1005 (2d Dist. 2001)). In determining whether a corporation is undercapitalized, courts "compare the amount of capital to the amount of business to be conducted and obligations to be

fulfilled" (id.).[18]

Here the only assets to which M.A. King had access at its
inception were the inventory, work in progress accounts and
accounts receivable assigned to it by Lay-Com, against which
assets M.A. King had assumed nearly $1.5 million of accounts and
notes payable.  Nor is there evidence of any actual infusion of
initial capital.  Even though the G.A.K. Trust was assertedly
supposed to buy $25,000 worth of M.A. King stock, there is no
evidence that the G.A.K. Trust (or any other entity) really
purchased any stock at all.  Moreover, with the G.A.K. Trust
being set up so that its sole proposed asset was M.A. King stock
purportedly "paid for" with a $25,000 promissory note from the
G.A.K. Trust itself, the entire arrangement smacks of nothing
more than self-levitation, not true corporate capitalization.

Moreover, as if to underscore that deficiency, Lay-Com
claims to have loaned $250,000 to M.A. King soon after its
creation.  Although it has offered no evidence of such a loan,[19]

_____

[18] Although Lord & Essex and Popp Junior assert that such a
determination requires "expert opinion," they cite to no caselaw
in support of that proposition (L.E. Resp. Mem. 11, ¶30).
Indeed, such cases as Fiumetto, id. at 959-60 resolve that issue
without the benefit (or detriment) of such opinion evidence.

[19] Lay-Com cites the deposition of King's accountant Jim
Halikias ("Halikias") (itself a violation, as noted above, of LR
56.1(b)(3)(B)) and Stip. ¶55 in support of its assertion (L.C.
Resp. Mem. 5-6).  But Lay-Com cites Halikias' deposition only in
general, pointing to no particular section or page number, and
this Court's review of that document revealed no evidence of such
a loan.  Similarly, although the citation to Stip. ¶55 is at

if it is assumed arguendo to be the case it simply drives another
nail into the coffin of inadequate capitalization, for it
confirms that the claimed G.A.K. Trust note (meaningless in
economic terms) and the lease and assignment of assets--subject
to the assumption of $1.5 million in liabilities!--were
inadequate to support M.A. King's operation as a viable entity.
In real world terms, the arrangement was no different from Lay-
Com's having conducted the business with M.A. King as a front.[20]

Relatedly, no credence can be given to Lay-Com's assertion
that despite M.A. King's lack of initial capital its "business
income was sufficient for [it] to pay its debts and retain net
earnings," so that it was not undercapitalized (L.C. Resp. Mem.
6). Not only does Lay-Com again point to no supporting evidence,
but the actual evidence is 180° opposed to that contention.
Importantly, as Funds point out, M.A. King never made any of the
monthly lease or bimonthly "Operations Fee" payments required
under the Master Lease and Assignment. Moreover, the record
reveals that M.A. King received a number of outright payments
from Lay Trust (with no indication that they were loans or that

least more precise, it too offered no supportive evidence.

[20]     In that respect, Lay-Com also footed the bill for new
equipment and materials to be used by M.A. King, over and above
the old King & Larsen assets it had leased to M.A. King.

there was any consideration received in return).[21]  In sum, the uncontroverted evidence shows, contrary to Lay-Com's contentions, that M.A. King's business income (whatever it might have been) was insufficient to meet all of its obligations on its own (see Fiumetto, 321 Ill.App.3d at 959-60, 749 N.E.2d at 1006).

That conclusion is further buttressed by the evidence that M.A. King's internal structure and external agreements precluded its existence as an independent entity.  It has already been shown that the record contains no evidence that anyone ever held any actual ownership interest in M.A. King, indicating instead that Lay-Com was really its de facto principal.  Indeed, the terms of the Master Lease and Assignment ensured that Lay-Com had effective control over M.A. King.  Under the Master Lease and Assignment M.A. King could engage in no cash or asset transfers, payments or distributions (other than ordinary business expenses) to any third party without both written authorization from Lay-Com and the payment of a "distribution bonus" to Lay-Com.

In addition, two of M.A. King's three director positions were filled by Lay-Com's officers and directors (Popp Junior and Popp Senior), reinforcing Lay-Com's de facto control over the corporation.  While such overlapping directorships alone do not necessarily demonstrate a unity of interest, the added fact that

---

[21]  Again the inadequacy of M.A. King's purported capitalization is reinforced by the transactions just referred to in n.20.

those overlapping directors exercised their powers to provide

Lay-Com further control over M.A. King certainly does.  In

particular, the M.A. King Board of Directors expressly limited

the powers of the corporate President so that he was both

(1) prohibited from borrowing money on behalf of M.A. King

without Lay-Com's written consent and (2) barred from authorizing

or approving any $2,500-or-over monetary obligations or

distributions of any kind without complying with the Master Lease

and Assignment's third party distribution restrictions--which, as

already noted, also essentially gave Lay-Com final say over such

distributions (as well as a bonus payment).[22]

Nor did Lay-Com deal with M.A. King as an independent arm's

length entity once the latter was up and running.  Lay-Com

allowed M.A. King to use the assets it had obtained from King &

Larsen--and continued to purchase even more equipment and

material on M.A. King's behalf--despite the fact that M.A. King

never made a single one of the lease or "Operation Fee" payments

required under the Master Lease and Assignment.  Instead it was

---

[22]  It is true but irrelevant, for these purposes, that King
violated those constraints by making payments to Funds and
entering into the September 11 Agreement:  When he did so, Lay-
Com promptly sued both King and M.A. King and obtained an Agreed
Judgment Order against them.  And Lay-Com itself recognizes, and
in fact relies on, the limitations on King's authority in other
contexts--for example, to support its superfluous claim that it
is not bound by the September 11 Agreement, it argues among other
things that King lacked the authority to enter into such a
contract on M.A. King's behalf in the first place (see, e.g.,
L.C. Resp. Mem. 9-11; L.C. R. Mem. 4, ¶¶10, 12).

not until it was discovered that King had executed agreements with the unions on behalf of M.A. King that Lay-Com took any action.

From every perspective, then, the unity of interest between M.A. King and Lay-Com has been established beyond peradventure. And to complete the veil-piercing analysis as to Lay-Com, Funds has also demonstrated conclusively that adhering to M.A. King's corporate fiction would "promote injustice." Through the series of structured transactions described earlier, Lay-Com was able to acquire King & Larsen's contract receivables and "shop materials," amounting to more than $1.2 million, as well as King & Larsen's "general intangibles" and its inventory of vehicles and mobile equipment, all in return for forgiving loans amounting to a fraction of those assets. And although Lay-Com purportedly assumed nearly $1.5 million in liabilities as part of the deal, it immediately foisted those liabilities, courtesy of the Master Lease and Assignment, onto an undercapitalized and unowned shell corporation--M.A. King.

Clearly any failure to pierce the corporate veil in this instance would "uphold a corporate arrangement to keep assets in a liability-free corporation while placing liabilities on an asset free corporation," thereby "promoting injustice" (Hystro Prods., 18 F.3d at 1390). And although what has already been said is sufficient unto the day, the situation may also fairly be

said to satisfy the other branch of <u>Hystro</u>'s "something more" requirement--"the existence of a compelling public interest" (<u>id</u>.)--because Defendants' effort, if successful, would subvert the statutory goal of assuring the solvency of group employee benefit plans.

In summary, given the evidence and arguments that Funds have proffered, coupled with Lay-Com's failure to rebut them in any real sense, no reasonable jury could fail to find that M.A. King was undercapitalized, unowned and effectively controlled by Lay-Com for its benefit, so that any notion of M.A. King's independent corporate existence must be rejected and liability must attach to Lay-Com. This Court therefore grants Funds' Rule 56 motion as to Lay-Com.[23]

What has been said up to now does not, of course, necessarily compel the same conclusion as to Funds' other Rule 56 targets, Lord & Essex and Popp Junior, both individually and as Trustee of Lay Trust. This opinion turns to that subject, which calls for a look at corporate veil-piercing other than in the corporation-to-corporation context.

---

[23] Lay-Com's and Lay Trust's Rule 56 motions challenge only the validity of the September 11 Agreement. As already stated and as Funds have repeatedly made clear (F. Resp. Mem. 4; F. R. Mem. 4-5), that challenge addresses an issue irrelevant to Funds' claims. But it fails on its merits as well. While the "doctrine of economic duress" may well be a "recognized affirmative defense" to contract actions in general (L.C. Mem. 6, ¶17), it is not available to employers in the ERISA context (<u>Agathos v. Starlite Motel</u>, 977 F.2d 1500, 1505-06 (7th Cir. 1992)).

On that score Defendants have advanced the unsupported
contention that corporate nonshareholders--directors, officers
and others--cannot be reached by piercing the corporate veil.  To
the contrary, courts of equity (which fashioned the veil-piercing
concept and remedy to begin with) are not at all as constrained
as Defendants would have it.  Thus, for example, <u>Fontana v. TLD
Builders, Inc.</u>, 362 Ill.App.3d 491, 501-03, 840 N.E.2d 767, 776-
78 (2d Dist. 2005) followed its analysis of the corporate veil-
piercing doctrine generally (an analysis substantively identical
to the one already set out in this opinion) with a section
captioned "Imposition of a Liability of a Corporation on a
Nonshareholder" that articulates and applies the principle that
corporate liability can be extended to nonshareholders even where
"the unity of interest and ownership requirement of piercing the
corporate veil could not technically be met" (<u>id</u>. at 501, 840
N.E.2d at 776).  And <u>Fontana</u> went on to support that proposition
not only by citing earlier Illinois caselaw but also by citing
cases elsewhere.  Essentially the gravamen of the court's holding
was the familiar one of "look[ing] to substance rather than form"
(<u>id</u>.), with the de facto exercise of control over the flawed
corporation (here that is M.A. King) leading to the imposition of
liability on the nonshareholder.

Application of that concept to Lord & Essex calls for a
"yes" answer to the question of its liability vel non.  Its

27

inextricable involvement in the series of successive transactions that were designed to substitute M.A. King, with its inadequate capitalization and its other more-than-suspect attributes, for King & Larsen renders Lord & Essex as well as Lay-Com culpable in that regard: No legitimate purpose has been proffered, nor can any be reasonably divined, for its having acted as a conduit or way station en route to Lay-Com's already-described involvement, with the totality of those transactions having been shaped in a fashion that would have left Funds high and dry.[24] And even after those transactions were entered into, Lord & Essex (like Lay-Com) failed to honor even the artificial structure that they had created--twice it made payments for earlier King & Larsen services to Lay Trust rather than to M.A. King.

As for Lay Trust, it was not directly involved (as were Lay-Com and Lord & Essex) in the web of transactions analyzed here, although it was and is Lay-Com's sole shareholder and it was also Lord & Essex' sole shareholder until March 2002 (after the events recounted in this opinion). In the absence of a showing that a corporation to which liability has been extended by piercing another corporate veil is itself vulnerable to such veil-piercing

---

[24] Funds' R. Mem. 3 n.1 points out that counsel who represented both Lay-Com and Lord & Essex drafted the Master Lease and Assignment and all the related documents that created the convoluted arrangement that this Court has been called upon to untangle in such a painstaking manner. But as has been seen here, the results arrived at in this opinion have not at all relied on any guilt-by-association notions.

(and nothing of that nature has been ascribed to Lay-Com or to Lord & Essex), it would stretch beyond any reasonable limit the principle exemplified by <u>Fontana</u> and like cases if liability were to be imposed on the second corporation's shareholders solely on the basis of their shareholdings.

Here however there is a plus factor: Lay Trust (like Lay-Com) made a number of direct payments to M.A. King during its life span, without evidence of any loan or other documentation, that by definition enabled M.A. King to continue its fragile existence, thus facilitating the effort to deprive Funds of their entitlement. Even though the question is a close one, this Court holds that Lay Trust too is potentially liable to Funds--but in light of its lesser complicity than that of Lay-Com and Lord & Essex, such liability will attach only if and to the extent that the assets of the two corporations were to prove inadequate to satisfy the judgment to which Funds are entitled here.[25]

Lastly as to Popp Junior in his individual capacity, the plus factor just identified as to Lay Trust is absent--his only

---

[25] This last provision is particularly appropriate in light of the penchant and ability of the related entities here, essentially under common control and often acting through common counsel, to structure transactions and move assets around in a way calculated to insulate them against liabilities such as those owed to Funds. If those machinations have somehow rendered Lay-Com and Lord & Essex financially incapable of honoring their legal responsibilities by correspondingly enriching Lay Trust (something that cannot be determined from the record now before this Court), Lay Trust must be expected to step up to the plate.

involvement during the relevant period was as an officer and director of Lay-Com and an officer of Lord & Essex. That is just not enough under the caselaw. Because Funds have put their best foot forward and failed, that calls not only for denial of their Rule 56 motion as to Popp Junior individually but also for the entry of judgment in his favor as a matter of law.

## Conclusion

For the reasons explained here at regrettably greater length than this Court would have preferred, the uncontroverted facts--with no genuine issue of material fact to blunt their impact--compel the following results as a matter of law:

1. Judgment is ordered to be entered in favor of Funds and against Lay-Com, Lord & Essex and Lay Trust (that is, against Popp Junior in his capacity as its Trustee) jointly and severally (but as to Lay Trust, on the contingent basis previously spelled out), in the sum of $2,487,723.62. To that extent Funds' Rule 56 motion is granted and those Defendants' Rule 56 motions are denied.

2. Funds' Rule 56 motion against Popp Junior individually is denied, while Popp Junior's individual motion is granted (although not for the reason that his memorandum had advanced). This action is ordered to be dismissed as to Popp Junior individually.

This Court expressly orders the entry of a final judgment in

those respects and determines that there is no just reason for delay (see Rule 54(b) and, e.g., <u>Continental Cas. Co. v. Anderson Excavating & Wrecking Co.</u>, 189 F.3d 512, 516, 517-18 (7th Cir. 1999) and cases cited there).  Finally, because there are two remaining defendants (Gail and Doralee) who were not implicated in the current motions, this action is set for a status hearing at 9 a.m. September 13, 2006 to discuss further proceedings.

_____
Milton I. Shadur
Senior United States District Judge

Date:  September 8, 2006